THE SECOND UNIVERSALIST SOCIETY *v.* THEODORE D. COOKE.

THEODORE D. COOKE *v.* THE SECOND UNIVERSALIST SOCIETY.

An act incorporating a religious society provided, that "the pew-holders in the society should have power to assess a tax, not exceeding ten per cent. per annum, on all pews, for the needful repair and insurance of their house of worship, and for the purpose of raising such sum or sums of money, yearly, therefrom, as may be thought expedient, for the support of the pastor of the church and congregation, and *for the payment of other incidental expenses to which the society may be subjected in maintaining and supporting religious worship regularly in said house*," and an amendment to the act further provided, that any pew-holder might surrender the occupancy of his pew or pews to the society, by giving three months notice, in writing, to the treasurer, "after the expiration of which time, the owner shall be exempt from all assessments on said pew or pews for the support of the pastor, and the same may be occupied and used by the society, or by them let; provided, however, any owner or owners of such pew or pews may resume the occupancy of said pew or pews, and hold the same in the same manner, and under the same terms, and subject to the same liabilities as before said surrender, after three months written notice to the treasurer of said society of the intention to do so;" *Held*, that these clauses of the act of incorporation imposed no obligation upon the society to apply its income from property and from the rents of its reserved pews, first, to the payment of the expenses incident to its ownership of property, and the residue, if any, to the maintenance of public worship, exclusive of the pastor's salary, and to tax the surrendered pews only to supply the deficiency of the income to pay other expenses, leaving the pastor's salary, it might be, to be paid wholly from taxes to be assessed upon the unsurrendered pews, but that the application of their income was left wholly at the option of the society; the only restriction upon the power to assess surrendered pews, being, *first*, that, in common with other pews, they should not be assessed, yearly, beyond the ten per cent. upon their valuation; and, *second*, that they should not be assessed for the support of the pastor.

EXCEPTIONS to an award of referees, to whom was referred, under a rule of this court, all causes of action, including all matters involved in three actions pending in this court, and one pending in the Court of Common Pleas for this county, between an incorporated religious society and its former pastor, who was also a large pew-holder in the society's church. One of the actions pending in this court was an action of assumpsit, brought by its former pastor against the society, to recover back taxes illegally assessed by the society, as was alleged, upon the plaintiff's pews, and paid by him through duress of his property

therein, under protest. The agreement for the rule expressly provided, that in all matters of law and fact upon the question of taxes, "the said referees, or either two of them, shall report specially the evidence and all questions upon the subject of taxes raised between said parties, with their judgment thereon, so that either party, by exception, may have the same finally settled by the court."

From the report of the referees it appeared, that the society had hired a lot in a central part of the City of Providence, and had erected thereon buildings, on the second floor of the principal of which was fitted up a room for religious worship, all other portions of the premises being rented by the society for business purposes of any reputable kind; the avowed aim of the society being, to realize from this property a nett income sufficient to defray, wholly or in great part, the expenses incident to the maintenance of religious worship in the room fitted up for that purpose.

By the fifth section of the act incorporating the society, it was provided, as follows :—

"Sec. 5. The pew-holders in said society shall have power to assess a tax not exceeding ten per cent. per annum, on all pews, for the needful repair and insurance of their house of worship, and for the purpose of raising such sum or sums of money yearly, therefrom, as may be thought expedient, for the support of the pastor of the church and congregation, and for the payment of other incidental expenses to which the society may be subjected, in maintaining and supporting religious worship regularly in said house."

By the second section of an act amending the act of incorporation, and, as found by the referees, passed at the same session, it was further provided :—

"Sec. 2. Whenever any pew-holder or pew-holders desire to surrender the occupancy of the pew or pews, by him, her, or them occupied, to the society, the same may be done by giving three months notice, in writing, to the treasurer of said society; after the expiration of which time, the owner shall be exempt from all assessments on said pew or pews for the support of a pastor, and the same may be occupied and used by the society,

or by them let; *provided, however,* any owner or owners of such pew or pews may resume the occupancy of said pew or pews, and hold the same in the same manner, and under the same terms, and subject to the same liabilities as before said surrender, after three months written notice to the treasurer of said society, of the intention to do so."

It was further reported, that until April, 1860, the invariable usage of the society had been, at its annual meeting, to estimate its probable income, and to make appropriations for its certain and anticipated expenses, (pastor's salary included,) for the coming fiscal year, and then assess a tax of from five to eight per cent. upon the valuation of the unsurrendered pews exclusively, to supply the estimated deficiency of income; that, upon the surrendered pews, no taxes, except two, in 1856 and 1858, for repairs of the church building proper, had ever been assessed; that Cooke, the late pastor, had been a pew owner, of one pew, from 1852,—of three or four, from 1855, and of 25½, from some time between 1857 and 1859; that he surrendered all his pews to the society, on the 18th day of January, 1860, and that, under this surrender, they continued to be in the society's charge until August 1st, 1860, when said Cooke resumed the control of them, and retained it until June 1st, 1861, when, for a second time, they came under the society's control by his surrender; that, at their annual meeting in April, 1860, the society appropriated their store rents for the coming year to the payment of the pastor's salary of $2000, and assessed a tax of six per cent. upon all the pews, surrendered and unsurrendered, to supply the means of paying ground-rent and other expenses, and in November, 1860, assessed an additional tax of four per cent. upon *all* pews, for repairs on the society's buildings, and to pay ground-rent and incidental expenses; and that, in April, 1861, the society again appropriated their store rents to the payment of the pastor's salary, and assessed a tax of ten per cent., payable in quarterly installments, upon *all* the pews, for general expenses.

It further appeared, that Cooke paid the first or July installment of this last assessment, under protest, and claimed, before the referees, to recover it back, as illegal and void. The referees adjudged that it was so, on the ground, that under the fifth sec-

tion of the charter and the amendment above set forth, the society should have first applied the rents of its buildings and reserved pews to the payment of the expenses incident to the ownership of its property,—such as ground-rent, insurance, repairs, &c. ; and then have applied the residue of its income to the maintenance of public worship ; and, if after so doing, there was a deficiency of $2500, and the pastor's salary was $2000, a tax upon *all* the pews, of $500, and upon the unsurrendered pews, of $2000, would have been just, and in accordance with the charter. They decided, however, that inasmuch as in January, 1860, under somewhat analagous circumstances, the society claimed from Cooke only a *pro rata* part of a quarterly installment, which he paid without objection then, and without complaint since, that he should recover back from the society one-third of this July installment only, which they found, with interest, amounted to $38.38.

All other exceptions to the report of the referees being waived at the hearing, the question submitted to the court, upon the exception of the society, related to this allowance to Cooke, and the construction put by the referees upon the above clauses of the charter of the society, which, in the judgment of the referees, justified it.

*Tillinghast, with whom was Bradley, for the Society.*

*T. A. Jenckes, for Cooke.*

AMES, C. J.   It is quite probable that the award of the referees, respecting the matter of this exception, is more fitted to do particular justice between the parties to this controversy, than one made in accordance with the requirements of law.   We are not at liberty, however, especially under the reservation in the rule in regard to questions of taxation, to adopt any other rule of decision than the general one set up by the law ; and judged by this, the award of the referees, in regard to the July installment of the tax assessed in April, 1861, must certainly be wrong.   If the tax was illegally assessed, it was no defence to the right of the pew-holder to recover back the whole of it, that, under similar circumstances, he had, without objection or complaint, paid a proportion of a like illegal assessment made in the previous year ; and if the tax was assessed in accordance with

the charter powers of the society, there is no good reason that he should recover back any portion of it.   To adjudge that the assessment was illegal, but that, nevertheless, he should recover back one-third, and only one-third of it, because he had to that, or some other like extent, once submitted to a similar unjust exaction, may, possibly, be very good practical justice, but would hardly come up to any standard of right known to the law.

W as the assessment in question illegal and void, for the reason assigned by the referees, or, for any, apparent in their report ? It seems to have been supposed by them, that it was so, under the fifth section of the act incorporating the society, as modified by the second section of the act amending it, upon the ground, that these sections require the society to apply all its income from property and from the rents of its reserved pews, first, to the payment of the expenses incident to its ownership of property, such as ground-rent, insurance, repairs, &c., and the residue, if any, to the maintenance of public worship, exclusive of the pastor's salary ; and to tax the surrendered pews only, to supply the deficiency of the income to pay other expenses, leaving the pastor's salary, in the case supposed by the referees, to be paid wholly from taxes assessed upon the unsurrendered pews.

Upon looking into the clauses of the charter referred to, it is obvious that they impose but two restrictions upon the right of the society to assess the surrendered pews : *first*, that common to all the pews, that they shall not be assessed beyond ten per cent. per annum ; and, *second*, that they shall be exempt from all assessments for the support of a pastor.   Every pew-holder holds his pew, with this protection only against the corporate power of the society to assess it for proper corporate expenses ; and we look in vain into these clauses for any further protection to pew-holders, who occupy or who have temporarily surrendered their pews, from the power of the corporation to assess them ; and still less, for any obligation upon the corporation to apply any income which it might derive from its property in the complex mode suggested by the referees.   This might be all very well, under some circumstances, and certainly would be for the owners of surrendered pews, if the purpose merely was to give them the greatest possible benefit from their exemption from the pastor's salary.

Cases may easily be supposed, however, in which, such an obligation to apply its income, coupled with the exemption, would deprive the society of the power to maintain, with decency, public worship,—in other words, of the power to carry out the principal purpose of its incorporation.    Unless forbidden by the charter, we must construe its powers so as to make them equal, at least, to this ; and certainly, not suppose restrictions upon the society with regard to the application of its income from property, not alluded to in the charter, which may disenable them from attaining it.

It may be quite possible, as suggested, that the motives of the majority of the society, in applying their income for the year 1861, may not have been the kindest towards their former pastor, in his character of a large holder of surrendered pews ; but in ascertaining whether, in a particular instance, the society has exceeded its corporate powers to assess such pews, we have nothing to do with the motives which swayed this majority, so that their action was legal, any more than we have with the motives of their former pastor, during his controversy with the society, in possessing himself of so large a number of pews, which ultimately, for his protection from assessment, he saw fit to surrender.    Fortunately, both are to be judged by us according to their legal, and not their moral merits ; and conforming our judgment to this more limited field of duty, and not touching the other less important grounds upon which the allowance excepted to is disputed, we order it to be stricken from the amount awarded to Mr. Cooke, and in all other respects, confirm the report of the referees.